

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_Michelle V. Larson_
_____
**United States Bankruptcy Judge**

**Signed August 24, 2021**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 7 |
| | § | |
| **JACOB F. WATTERS** | § | Case No. 20-30553 |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| **RETICULUM  MANAGEMENT, LLC,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Pro. No. 20-3088 |
| | § | |
| **JACOB F. WATTERS,** | § | |
| | § | |
| Defendant. | § | |
| | § | |

### MEMORANDUM OPINION

The Court conducted a trial on the Original Complaint Objecting to Dischargeability of a Debt Under 11 U.S.C. § 523 (the "**Complaint**") filed by Plaintiff Reticulum Management, LLC (the "**Plaintiff**" or "**Reticulum**") against Debtor-Defendant Jacob F. Watters (the "**Debtor**," and, together with the Plaintiff, the "**Parties**"). By its Complaint, the Plaintiff seeks a determination that Debtor's debt to Plaintiff in the amount of $993,447.75 is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6).

The Debtor denied the factual basis for the Plaintiff's claims and asserted the following affirmative defenses in his Answer to the Complaint (the "**Answer**"): (1) failure to state a claim; (2) Plaintiff's lack of justifiable or reasonable reliance; (3) Debtor's good faith/lack of actual fraudulent or deceptive intent; (4) lack of proximate cause; (5) preclusion; (6) offset, recoupment, credits, payments – single satisfaction rule; (7) failure to mitigate damages; and (8) defenses provided by the Texas Business Organizations Code.

The Court has considered the pleadings and all briefing filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel. The following constitutes the Court's findings of fact and conclusions of law[1] in support of its ruling as required under Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

As will be set forth more fully below, the Court finds and concludes that the Plaintiff failed to carry its burden of proving nondischargeability under § 523 of the Bankruptcy Code. As such, the requested relief is hereby denied.

## I.    <u>Jurisdiction and Venue.</u>

---

[1] Any finding of fact that should more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). The bankruptcy court has authority to adjudicate this matter pursuant to the United States District Court for the Northern District of Texas Miscellaneous Order No. 33. Both Parties have consented to this Court hearing this matter and determining the issues on a final basis.

## II.  <u>Procedural Posture</u>

On July 6, 2020, the Plaintiff filed its Complaint seeking a determination that its claim against the Debtor arising from the Final Arbitration Award (as defined below) is nondischargeable pursuant to Section 523 of the Bankruptcy Code. The Debtor filed his Motion to Dismiss the Complaint on August 7, 2020, in which he asserted that the Court lacked jurisdiction to hear the Complaint under the *Rooker-Feldman* doctrine, and that the Complaint was time barred. The Court held a hearing on the Motion to Dismiss on September 17, 2020, and entered its Order Denying the Motion to Dismiss on the same day.

On October 2, 2020, the Debtor filed his Answer, in which he denied the factual basis for the Complaint and asserted a number of affirmative defenses. The Debtor filed his Motion for Summary Judgment and Brief in Support thereof on October 15, 2020, asserting several grounds for the entry of summary judgment in its favor, including primarily that the Final Arbitration Award collaterally estopped Plaintiff from asserting the § 523 discharge objections in the Complaint. The Plaintiff responded in opposition to the Debtor's Motion for Summary Judgment on November 16, 2020. On December 16, 2020, the Court held a hearing on the Motion for Summary Judgment and thereafter took the matter under advisement. The Court entered its Order Denying the Debtor's Motion for Summary Judgment on January 13, 2021.

The Plaintiff and the Debtor each filed their Proposed Findings of Fact and Conclusions of Law on April 29, 2021. Thereafter, on May 4, 2021, the Parties filed a Joint Pre-Trial Order in which the Parties stipulated to this Court's jurisdiction, the venue for the trial, and certain very basic relevant dates, otherwise leaving the bulk of the relevant facts contested. The Court held a trial beginning on May 11, 2021. The Plaintiff's presentation of evidence in its case-in-chief concluded on May 14, 2021, at which point the Debtor made an oral motion for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52, made applicable in bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7052. The Court denied the Debtor's oral motion by bench ruling on May 20, 2021. On May 27, 2021, the Defendant's presentation of evidence in its case-in-chief concluded. The Court heard closing arguments from the Parties on May 28, 2021, and thereafter took the matter under advisement.

## III. Findings of Fact

### A. The Parties

The Plaintiff is a limited liability company formed under the laws of the state of Texas on August 6, 2013. Charles William Durham and his spouse, Tara Durham (together with Mr. Durham, the "**Durhams**") were the Plaintiff's sole members at its formation. The Durhams originally formed the Plaintiff for the purpose of owning residential real estate. Mr. Durham also, independently, acted as an investment and financial advisor to Fred Brown, an individual residing in Dallas County, Texas and around whom the majority of this case centers. On or about September 26, 2016, the Durhams transferred their ownership interests in the Plaintiff to Mr. Brown, who then became and remains the sole member of the Plaintiff.

The Debtor is an individual residing in Dallas County, Texas. The Debtor holds a bachelor's degree in Finance from Bradley University and holds a Master of Business

Administration degree from Southern Methodist University's Cox School of Business. The Debtor began working in the field of private equity investing in 2005 and has experience both working for a private equity firm and independently pursuing investment opportunities.

**B. Factual Background**

In 2005, Harrold "Tex" Allen, Jason Allen (together with his father, Tex, the "**Allens**"), and Dave Brickey formed Total Operating, LLC ("**Total Operating**") for the purpose of providing ancillary services in the oil and gas industry. Total Operating provided a wide variety of services, including pipeline construction, right-of-way mowing, and mapping. Total Operating grew rapidly after its formation, reaching annual revenues of approximately $8 million by 2012. In that same year, Total Operating spun off its right-of-way and mapping divisions to focus primarily on constructing pipelines under 8,000 feet in length. Around that time, Mr. Brickey met the Debtor and discussed Total Operating and its recent growth, as well as the Debtor's experience investing in and growing companies.

Thereafter, in 2013, the Debtor and William Berry Dean, III, the Debtor's former co-worker and partner, met with the Allens and Mr. Brickey at Total Operating's office in Alvord, Texas to discuss the Debtor and Mr. Dean investing in Total Operating. The Allens indicated to the Debtor and Mr. Dean during this meeting that Total Operating needed significant capital to continue funding its growth and expand into more overhead-intensive large pipeline projects. The Debtor and Mr. Dean represented that they had access to large financial resources and could aid in acquiring capital to fund Total Operating's continued growth. After this meeting, the Allens and Mr. Brickey agreed to sell a 60% ownership interest in Total Operating to T.O. Investment I, LLC ("**TOI**"), an entity formed on October 25, 2013, for the purpose of acquiring the ownership interest

5

in Total Operating, and in which the Debtor and Mr. Dean held ownership interests.[2]  After the transfer of ownership interests, Tex and Jason Allen held 27.37% and 12.63% interests in Total Operating, respectively.   Mr. Brickey did not retain an ownership interest.   As part of the transaction, the Allens agreed to allow TOI to fill three of the five seats on Total Operating's board of managers.   TOI appointed the Debtor, Mr. Dean, and Paul Thompson to fill the board seats apportioned to it, while Tex and Jason Allen retained the remaining two board seats.  The Debtor's primary responsibility with regard to Total Operating was managing the company's debt, including seeking out new sources of debt financing.

Prior to the ownership transfer, Total Operating maintained a line of credit with First State Bank.   Beginning in February of 2013, however, Total Operating entered into a lending relationship with Capital One, in which Capital One loaned $1.2 million to Total Operating with a maturity in August of 2017, and for which Total Operating granted Capital One a senior lien on substantially all of Total Operating's assets.  Utilizing this loan, Total Operating began purchasing large numbers of vehicles for use in Total Operating's operations.   Total Operating also supplemented its cash flows prior to the ownership transfer by factoring invoices with extended due dates.  Total Operating continued this practice after the transfer of ownership to TOI.

In 2014, Total Operating participated in a competitive bidding process for the construction of an oil and gas pipeline for Jetta Operating Company, Inc. ("**Jetta**") in Pecos, Texas (the "**Jetta Project**").  Jetta accepted Total Operating's bid for a lump sum of $3.5 million, plus any additional work Jetta requested, in November of 2014.   Keeping with its prior practice, and to generate cash flow and cover the significant upfront and overhead expenses related to the Jetta Project, Total

---

[2] The Debtor and Mr. Dean were not the sole owners of TOI.  The Debtor owned, through CCA Partners, LLC, a 2.5% interest in TOI.  Overall, the ownership interests in TOI were divided amongst 15 individuals, including the Debtor and Mr. Dean.

Operating began factoring the Jetta Project invoices.  The Jetta Project, however, encountered a number of problems, including severe inclement weather, which delayed completion of the project and Total Operating's realization of profits.  This delay caused significant financial strain for Total Operating.  The evidence showed a number of emails in which Total Operating's management, including the Debtor and Mr. Dean, expressed some concern about Total Operating's continued operation.  Thus, by the middle of 2015, Total Operating began seeking out sources of new capital, with the Debtor and Mr. Dean being the two principals primarily seeking out new investors for a new round of financing.[3]  The Allens, on the other hand, focused primarily on operations.

The Debtor eventually found interested investors in his father, Russell Watters, and Mr. Brown.  The Debtor originally sought what was characterized as a short-term bridge loan in the amount of $500,000.00 from Mr. Watters alone.  Mr. Watters, however, was unable to fund the entirety of the loan individually.  Thus, the Debtor reached out to Mr. Durham, with whom the Debtor had become familiar through a mutual friend beginning in 2013.  Mr. Durham connected Mr. Brown and the Debtor, as Mr. Brown had experience making highly collateralized secured loans in the past and would potentially be a source of capital for Total Operating.  Mr. Brown, the Debtor and Mr. Russell Watters were also familiar with each other from another real estate project in Illinois, the Caseyville Project.

In connection with Total Operating's seeking out financing, the Debtor and Mr. Dean prepared[4] a PowerPoint presentation (the "**Presentation**") on behalf of Total Operating, which was designed to provide investors and lenders with information about the financial and operational

---

[3] Mr. Dean testified credibly that, during this same period, he attempted to purchase the Debtor's interest in TOI for a multiple of the Debtor's original investment.  Mr. Dean also testified that TOI had been approached by a potential buyer that had expressed interest in acquiring Total Operating.
[4] The Debtor, Mr. Dean, and Mr. Thompson each testified that all of the board members had a hand in preparing the Presentation.  Mr. Allen disputed his involvement.

status of Total Operating for the purposes of raising potential capital. The Presentation was provided to Mr. Brown and Mr. Watters by the Debtor in connection with Total Operating's efforts to encourage them to make a bridge loan.[5] The Debtor and Mr. Dean also made oral representations to Mr. Durham and Mr. Brown.[6]

Soon thereafter, Mr. Brown agreed in principle to loan $400,000.00, in addition to Mr. Watters' agreement to loan $100,000.00, to Total Operating as bridge capital to enable Total Operating to realize profits on the Jetta Project. Out of concern for the ramifications of engaging in a related-party transaction between the Debtor and his father, the parties to this lending arrangement decided to utilize Mr. Durham's company, Reticulum, as a pass-through entity. Mr. Brown utilized two entities he owned and controlled, CABFBB Corp. and FABNEXT Corp., to fund his side of the transaction. These entities, along with Mr. Watters, entered into loan agreements with Reticulum, which would in turn contract with Total Operating.

The Parties ran into difficulty with the "short-term bridge loan" arrangement, however, when they could not obtain the necessary consent from Capital One to grant a lien on the Plaintiff's assets. In the meantime, the liquidity crisis at Total Operating worsened. Thus, to expedite the process and circumvent the immediate need for Capital One's consent, the Parties chose to structure the loan as a Sale and Buyback Agreement (the "**SBA**"), which Reticulum and Total Operating executed on July 27, 2015. Pursuant to the SBA, Reticulum purchased (i.e., Total

---

[5] The PowerPoint presentation indicates that it was prepared by "CCA Partners." CCA Partners, LLC was a merchant banking boutique that invests in entrepreneur-owned businesses through debt or equity investments. The Debtor testified at trial that, currently, it is "pretty much a non-operating entity" but that he had previously held an ownership interest in it. As will be discussed below, in addition to the Presentation, admitted into evidence was Total Operating's fixed asset report (the "**Asset Report**"). Although Plaintiff alleged that the Debtor and Mr. Dean provide the Asset Report to Mr. Durham and Mr. Brown, Mr. Durham testified that he did not see the Asset Report (dated May 2014) prior to the legal proceedings. Mr. Brown was the only witness who testified that the Asset Report was distributed externally from Total Operating. At that time, Mr. Brown was not a member or manager of Reticulum.

[6] In the Complaint and subsequent briefing, including the Plaintiff's Proposed Findings of Fact and Conclusions of Law, the Plaintiff created a list of fourteen specific representations that it alleges were misrepresentations when they were made. The Court will discuss these alleged misrepresentations specifically in its Conclusions of Law.

Operating *sold*) the right to receive the future profits from the Jetta Project for $500,000.00. Total Operating retained a buyback option (the "**Buyback**") on those profits, with a buyback price of $535,000.00 (the "**Buyback Price**") and an expiration date of October 30, 2015 (the "**Buyback Date**"). The SBA provided for payback in advance as follows:

> [Total Operating] agrees to pay over to [Reticulum] the unfactored Jetta Resources receivables from Jetta Resources invoices generated after July 27, 2015 in excess of the Triumph credit limit[7] as received as installment payments towards the Buyback. All installment payments will be netted against Buyback Price to settle the buyback before or on the Buyback Date.

An earlier draft of the SBA contained similar language but provided for installment payments from *all* receivables from Jetta invoices, rather than only *unfactored* Jetta invoices. The language was changed in response to a suggestion from Mr. Dean that such language would comport better with Total Operating's relationship with Triumph.

The SBA further provided that, in the event that Total Operating failed to execute the Buyback, Reticulum would have the following remedies:

> [Reticulum] may take any and all legal actions necessary to compel [Total Operating] to comply with this Agreement which may include conversion in a senior subordinated note to [Total Operating] which shall be senior to all debt securities of the Company except for Capital One Term loans and Triumph collateral on the Company's receivables through its factoring arrangement, for the greater of guaranteed profit amount on the Project or the Buyback Price (less all payments actually received), and such a note shall be no greater than 1 year in term and pay an interest rate at the maximum allowable rate, and any other legal remedies the laws of the state of Texas allow.

After the execution of the SBA, the Jetta Project encountered further setbacks, including a pipeline explosion and a general, sharp decline in the oil and gas industry. These setbacks further delayed Total Operating's realization of profits from the Jetta Project and necessitated further

---

[7] Triumph Business Capital ("**Triumph**") is an invoice factoring company that provided factoring services to Total Operating during the events relevant to this case. Triumph only permitted Total Operating to factor invoices up to a certain credit limit, at which point Triumph would refuse to factor further invoices until it could achieve collection on the previously factored invoices.

factoring through Triumph. Ultimately, Total Operating did not remit any unfactored receivables to Reticulum, nor did it execute the Buyback on the Buyback Date. Despite this default, the relationship between Reticulum and Total Operating remained positive for a time. During this period, on December 15, 2015, at Capital One's request, Ritchie Bros. Auctioneers ("**Ritchie Bros.**") prepared and delivered to Total Operating an appraisal report (the "**Ritchie Report**"), in which Ritchie Bros. appraised all equipment in Total Operating's possession, including equipment Total Operating had leased, for a total value of $4,133,500.00. After obtaining the Ritchie Report, the Debtor sent a copy to Mr. Durham with hand-written notations showing which pieces of equipment were leased and stating that the value of *owned* equipment only was $1,848,000.00.

In early 2016, the relationship between Total Operating and the Plaintiff began to sour. On February 12, 2016, the Plaintiff delivered to Total Operating a demand letter, signed by Mr. Durham as "President," seeking to collect under the SBA. The Plaintiff sent another demand letter on March 14, 2016, in which the Plaintiff stated that the amount due pursuant to the SBA was $591,150.86, and noting that the Plaintiff had "filed a UCC claim on all assets, second only to" the Capital One loan agreement and blanket lien and Triumph's collateral securing the factoring line of credit.[8] Plaintiff did, on March 14, 2016, file such a UCC-1 financing statement.[9] Likewise, the operational tensions at Total Operating became untenable internally between the Allens, on the one hand, and the Debtor and Mr. Dean, on the other. On March 11, 2016, the Allens filed a state

---

[8] At trial, only the March 14, 2016 demand letter was offered and admitted into evidence. That demand letter makes reference to a demand letter dated February 12, 2016 and states that "[t]he period to cure per [that] letter expired" on March 14, 2016. No objection was raised to the admission of the March 14, 2016 letter, thus the Court finds no reason in the record to doubt that a similar demand letter was sent on February 12, 2016.

[9] At trial, no party sought to enter a copy of the filed UCC-1 into evidence. Furthermore, in the Plaintiff's Objections to Defendant's Proposed Exhibits Designated on Defendant's Exhibit List, the Plaintiff objected to Defendant's exhibit 106, a copy of the UCC-1 it filed, on grounds of authenticity, genuineness, and hearsay. Regardless, the Court may take judicial notice of the filing of the UCC-1 without addressing the contents thereof or evaluating the truth of the matters asserted therein. *Katchadurian v. NGP Energy Capital Mgmt., LLC (In re Northstar Offshore Grp., LLC)*, 616 B.R. 695, 713 (Bankr. S.D. Tex. 2020). Therefore, the Court hereby takes judicial notice of the filing of the UCC-1 on March 14, 2016.

court action against the Debtor and Mr. Dean, alleging claims for breach of contract, breach of fiduciary duty, fraudulent inducement, violations of the Texas Business & Commerce Code, and conspiracy.

Meanwhile, during the first half of 2016, Total Operating's financial outlook continued to sour as the global oil crash continued to worsen,[10] and it began selling its assets.  By May 2016, in an attempt to offer further assurances of repayment to the Plaintiff, the Debtor authorized[11] the execution of a security agreement (the "**Security Agreement**") by Total Operating in favor of Reticulum.[12]  The Security Agreement purported to be "effective October 30, 2015," notably, the Buyback Date pursuant to the SBA.  Shortly thereafter, on June 22, 2016, the Plaintiff filed a state court action against Total Operating and sought and obtained a temporary restraining order halting Total Operating's sale of its assets.  On July 30, 2016, Total Operating filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code.[13]

On May 23, 2017, the Plaintiff filed a presuit petition in Texas state court against the Debtor and Mr. Dean, individually.  Through the presuit petition, the Plaintiff sought to investigate claims for, *inter alia*, fraud, fraud by non-disclosure, fraudulent inducement, and negligent

---

[10] Pursuant to Federal Rule of Evidence 201, made applicable in this proceeding by Fed. R. Bankr. P. 9017, the Court may take judicial notice of facts that are not subject to reasonable dispute because they are generally known within the Court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)(1)–(2).  The Court sits in Dallas County, Texas, in which it is generally known that oil and gas prices experienced a serious crash during this case's relevant time period.  Furthermore, other accurate sources abound with discussion about the 2014–16 oil and gas crash.  *See, e.g.*, *See* Tim Daiss, *Worst Oil Crash In A Generation: When Will It End?*, Forbes (Sep. 2, 2016, 10:08 PM), https://www.forbes.com/sites/timdaiss/2016/09/02/worst-oil-crash-in-a-generation-when-will-it-end-2/?sh=6cd94574446b (discussing the state of the global oil and gas market from the period 2014–16).  Furthermore, in Plaintiff's opening statement, its counsel admitted that these events coincided with the oil and gas crisis.  As such, the Court takes judicial notice of the oil and gas crisis, as relevant to this case.

[11] The testimony elicited indicated that the Debtor did not inform his fellow board members of his authorization to execute the Security Agreement.

[12] The exact date on which the Parties executed the Security Agreement was not clear from the evidence elicited at trial.  Although bearing on the credibility of various witnesses' testimony in prior proceedings concerning when the Security Agreement was executed, the exact date of execution has little relevance to the material issues in this case.

[13] *In re Total Operating LLC*, Case No. 16-70245-hdh-7, Non-Individual Chapter 7 Voluntary Petition, ECF No. 1.

misrepresentation relating to the Debtor's and Mr. Dean's actions in connection with the SBA and the Security Agreement. The Debtor filed, and on August 15, 2017, was granted, a motion to stay the state court action and to compel arbitration pursuant to the SBA. On November 13, 2017, the Plaintiff filed its demand for arbitration against the Debtor and Mr. Dean with the American Arbitration Association (the "**AAA**"), commencing AAA Case No. 01-17-0006-8709. The Parties presented their respective cases to an arbitration panel (the "**Arbitration Panel**") from October 22 through October 24, 2018. On December 3, 2018, the arbitration panel entered its interim award against the Debtor and Mr. Dean, jointly and severally, in the amount of $500,000.00 (the "**Interim Award**"), finding that the Debtor and Mr. Dean were liable to the Plaintiff for negligent misrepresentation. In the Interim Award, without further specific findings, the Arbitration Panel found that the Plaintiff failed to present sufficient evidence to establish all the elements of fraud, fraud in the inducement, and fraud by non-disclosure *or* that the Plaintiff failed to overcome the Debtor's and Mr. Dean's defenses thereto.

On January 9, 2019, Mr. Dean filed a voluntary petition pursuant to Chapter 7 of the Bankruptcy Code.[14] To avoid running afoul of the automatic stay resulting from Mr. Dean's filing, the claims against the Debtor were severed and the Arbitration Panel entered its final award against the Debtor in the amount of $993,447.75[15] (the "**Final Award**"), as well as post-award interest at the rate of 5.25%.

The Debtor filed his voluntary petition pursuant to Chapter 7 of the Bankruptcy Code commencing the above-captioned bankruptcy case on February 19, 2020.

### C. Witness Credibility Determinations

---

[14] *In re William Barrett Dean, III*, Case No. 19-31232-sgj-7, Chapter 7 Voluntary Petition, ECF No. 1.
[15] The Final Award consisted of the $500,000.00 in damages the Arbitration Panel awarded in the Interim Award, $434,966.36 in attorney's fees, $8,085.00 in administrative fees due to the AAA, $15,660.00 in arbitrator fees, and $34,736.39 in pre-award interest.

Of particular importance, and difficulty, in this case was the credibility of the witnesses who testified at trial. As described above, the operative events culminating in this adversary proceeding began more than half of a decade ago. Although both Parties brought voluminous documentary evidence with them to trial, much of the evidence upon which each side relies was witnesses' best recollection of events, representations, and interactions occurring many years prior to the testimony elicited. As such, and although the Court recognizes the importance of witness credibility, the Court is compelled to evaluate credibility with a somewhat softer hand than it otherwise may be inclined to use, in recognition of the very substantial time that elapsed between the factual occurrences and the trial. Thus, in coming to these findings of fact and conclusions of law, the Court afforded less weight to, for example, the often-inconsistent testimony between various depositions, the arbitration proceeding, and trial testimony. This issue was compounded by the fact that numerous factual and legal issues, such as the date of the execution of the Security Agreement and the Jetta Project explosion were not raised in prior proceedings. To be certain, the Court closely monitored and evaluated the apparent truthfulness of each witness in delivering his answers to questions and noted any instances where trial testimony departed materially (*i.e.*, in a manner inconsistent with simple mistakes in long-term memory) and factored each of these into its decision.

Further complicating these credibility determinations was the extensive interconnectedness of the witnesses. Some of the witnesses had known each other for long periods of time, were close professional colleagues, and were perhaps close friends prior to and during the events described. The testimony at trial showed that, almost universally, these relationships had devolved and were characterized by vitriol and resentment between several of the witnesses. As such, concerns about bias and the effect that strongly held negative emotions can have on memory exacerbated the

Court's task of sifting through what was truly inconsistent or incomplete testimony and what was a simple failure of memory of events long past. It became apparent during the course of the trial that some answers and narratives, over the course of the arbitration and this case, appeared to have been repackaged to suit a litigation narrative.[16] In particular, testimony about alleged oral representations often departed dramatically from what the documentary evidence showed. As such, the Court reiterates that it approached these credibility determinations with great care and attention to each of the factors discussed above.

*1. The Debtor*

The Court finds that the Debtor was generally a credible witness. The Debtor appeared to answer questions posed to him truthfully to the best of his recollection, if, at times, artfully rather than directly. Although Plaintiff's counsel, on several occasions, noted that the Debtor's trial testimony deviated from his prior deposition testimony in the arbitration, the Court was not persuaded that these inconsistencies were indicative of a lack of credibility, but more attributable to slight failures of memory, which were common to each and every witness that testified. Nevertheless, the Debtor credibly testified as to his knowledge and opinions of the financial situation at Total Operating during his involvement with the company and the representations he recalled making to Mr. Russell Watters, Mr. Durham and Mr. Brown. The Debtor's credible testimony, along with the fact that he and his family invested alongside Reticulum, significantly undermined the Plaintiff's allegations as to his fraudulent intent, as will be discussed more fully below.

---

[16] The Court is not implying foul play or dishonesty from either Party or any witness. Rather, the Court recognizes the effect that the passage of time, strong emotions, and repeated litigation may have on otherwise genuine, truthful testimony. The Court therefore recognizes that testimony may be both genuine and truthful, and yet inconsistent with or illogical when compared to the weight of the other testimony. This disconnect will be discussed further below as the Court analyzes the documentary evidence and its relationship with the testimony elicited regarding oral representations.

*2. Fred Brown*

The Court likewise finds that Mr. Brown was generally a credible witness. Mr. Brown appeared to answer questions truthfully to the best of his recollection for the majority of his testimony, but exhibited a pattern of recalcitrance, particularly on cross-examination, when forced to admit inconvenient truths. Mr. Brown's testimony appeared consistent with the portions of his testimony in the arbitration presented to him on cross-examination. Despite repeated attacks on Mr. Brown's memory from the Debtor's counsel at trial, the Court was not persuaded that any failure of Mr. Brown's memory was indicative of a lack of credibility or testimonial capacity, but rather, like the Debtor, attributable to the length of time that has passed since the events in question. As discussed more fully below, the failings of Mr. Brown's testimony were not necessarily a lack of credibility so much as (i) a "hands off" approach to the original investment and (ii) the fact that most of the alleged fraudulent misrepresentations were (x) made to him in his capacity as a lender to Reticulum, rather than directly to Reticulum, the Plaintiff, and (y) were contradicted by contemporaneous writings.

*3. William "Barrett" Dean*

Mr. Dean was generally a credible witness. Mr. Dean appeared to answer questions truthfully to the best of his recollection. Mr. Dean is one of the three primary figures at the center of this case, along with the Debtor and Mr. Brown. Mr. Dean is an experienced private equity investor and was intimately involved with the finances of Total Operating during this period. His testimony was important in presenting to the Court the general tenor of the operational and financial decline of Total Operating, the Parties' general subjective hopes for success, as well as the process of obtaining the loan from the Mr. Watters and Mr. Brown through the Plaintiff. Thus,

15

this finding of credibility carries significant weight and, like the Debtor's credible testimony, is very probative on the issue of fraudulent intent.

### 4. Russell Watters

Mr. Russell Watters was not available to testify live during the trial. Instead, the Parties agreed to play a 90-minute portion of his video deposition in lieu of his testimony. After viewing and listening to Mr. Watters' deposition, the Court finds that his testimony was credible. This determination is somewhat limited by the fact that the Court was not present live to observe the witness, as with the witnesses at trial. Regardless, Mr. Watters appeared to answer questions posed to him truthfully to the best of his recollection. Mr. Watters' testimony was significantly more consistent with the Debtor's case than the Plaintiff's. As one of the two individuals funding the SBA, Mr. Watters' consistent, credible testimony was very relevant to the Court's conclusions below. Although Mr. Watters may understandably have some bias as it relates to the fact that the Debtor is his son, the Court does not believe that such relationship had any bearing on the truthfulness of his answers in his deposition.

### 5. Bill Durham

The Court finds that Mr. Durham was generally a credible witness. Mr. Durham testified that he had known both the Debtor and Mr. Brown for extended periods of time prior to the transaction in question. Mr. Durham, as President and owner of the Plaintiff prior to Mr. Brown's acquisition thereof, was present and involved both in the process of Total Operating obtaining the loan from the Plaintiff and in the aftermath of Total Operating's default under the SBA.[17] Mr. Durham testified that he had a very minor economic interest in the transaction, through which he received approximately $1,200.00 as a fee for his involvement. He is also still a financial advisor

---

[17] Mr. Durham testified that Reticulum became involved with the transaction approximately one week before closing and that he was not actively involved in any of the negotiations with respect to the SBA.

to Mr. Brown, which on its face, indicates a certain degree of bias.  Mr. Durham particularly struggled, however, in his testimony related to the circumstances leading up and attendant to the execution of the Security Agreement.

*6. Paul Thompson*

The Court finds that Mr. Thompson was generally a credible witness.  Mr. Thompson was a colleague of the Debtor and Mr. Dean and a manager on the board of managers of Total Operating.  He is also a current colleague of Mr. Dean, which on its face, indicates a certain degree of bias.  Mr. Thompson testified that his role at Total Operating was primarily to advise on the operations of the company, but that he had virtually no role in negotiating the transaction at issue.  Mr. Thompson's primary contribution to the record was descriptions of and opinions on the operational health of Total Operating.

*7. Jason Allen*

Finally, Jason Allen was called as a rebuttal witness for the Plaintiff and the Court finds that he was generally credible.  Mr. Allen appeared to answer questions truthfully to the best of his recollection.  Mr. Allen's primary point of rebuttal was to the testimony of the Debtor, Mr. Dean, and Mr. Thompson that Total Operating, in 2015, was structurally sound with good revenue prospects, but simply in need of short-term cash.  Mr. Allen testified that the situation was much more dire and that, at least by July 2015, there were commonly held concerns about the bankruptcy of Total Operating.  The Court found this testimony to be credible from Mr. Allen's perspective, but in light of his admitted lack of expertise in reading and interpreting financial statements and his lack of personal knowledge of the economics of the Jetta Project, the Court does not find his

testimony particularly relevant.[18]   Likewise, Mr. Allen's testimony regarding his involuntary departure from Total Operating and his prior lawsuit against the Debtor and Mr. Dean indicated the distinct possibility of bias affecting certain portions of his testimony.

## IV.   **CONCLUSIONS OF LAW**

The mysterious, but ever-wise, Creed Bratton from *The Office* once said, "Bankruptcy is nature's do-over.  It's a fresh start.  It's a clean slate."  More poignantly, the Supreme Court has noted that: one of the main purposes of the federal bankruptcy system is to aid the unfortunate debtor by giving him a fresh start in life, free from debts, except of a certain character.  *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1758 (2018).  The Plaintiff seeks to except its debt from discharge pursuant to §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(6).[19]  Exceptions to discharge must be strictly construed against the creditor and liberally construed in favor of the debtor to avoid interfering with the debtor's fresh start.  *Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 349 (5th Cir. 2017); *Fairlane Fixed Income Fund, LLC v. Feigl (In re Feigl)*, Case No. 19-34156, 2020 WL 5753311, slip op. at *6 (Bankr. N.D. Tex. Sept. 25, 2020) (Hale, J).   The objecting creditor bears the burden of proving nondischargeability by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

## A.   **Section 523(a)(2)(A)**

To prove nondischargeability pursuant to § 523(a)(2)(A), the Plaintiff must show that the Debtor owed the Plaintiff a debt "for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual

---

[18] Many of the representations that the Plaintiff alleges were fraudulent related directly to the financial health of Total Operating and to the economics, including the degree of factoring of invoices, of the Jetta Project.  Although Mr. Allen certainly demonstrated in depth knowledge of Total Operating on an operational level, on cross-examination he testified that he was "not very good at reading financials," did not bid the Jetta Project, did not know the amounts of the bids on the Jetta Project, and did not work on the Jetta Project.

[19] As an initial note, no Party to this adversary proceeding challenged the validity of the debt owed to the Plaintiff. The only arguments raised in the pleadings and at trial are whether the debt is nondischargeable.

fraud." 11 U.S.C. § 523(a)(2)(A). Proving that the Debtor made false representations requires that the Plaintiff show: (1) the existence of a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the Plaintiff. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir. 1995), *abrogated on other grounds by Husky International Electronics, Inc. v. Ritz*, 578 U.S. 882, 136 S. Ct. 1581, 1590 (2016).

Actual fraud, for purposes of § 523(a)(2)(A), requires that the Plaintiff prove that: (1) the Debtor made a representation; (2) the Debtor knew that the representation was false at the time it was made; (3) the Debtor made the representation with the intent and purpose to deceive the Plaintiff; (4) the Plaintiff relied on the representation; and (5) the Plaintiff sustained a loss as the proximate result of its reliance on the representation. *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017) (citing *In re Ritz*, 787 F.3d 312, 319 (5th Cir. 2015)).[20]

In this case, the Plaintiff alleges that the Debtor made the following representations, each of which, Plaintiff contends, meets the criteria of both a false representation and actual fraud:

- The requested loan would be a short-term loan;

- Total Operating had recently won the Jetta Project and needed funding to proceed to work on it;

- The funds from the Plaintiff would be exclusively used for the Jetta Project;

- The Jetta Project would provide quick cash flow to pay back the short-term loan;

- The first $500,000.00 that came back from the Jetta Project would immediately go to pay off the Plaintiff's loan;

---

[20] In *Husky International Electronics, Inc. v. Ritz*, the Supreme Court reversed the Fifth Circuit's decision, holding that actual fraud, for purposes of § 523(a)(2)(A), could be proven by forms of fraud, such as fraudulent conveyance schemes, that could be effected without a false representation. 136 S. Ct. at 1586. On remand, the Fifth Circuit held that the Supreme Court's decision effectively reversed prior Fifth Circuit precedent holding that a representation was required to prove actual fraud under § 523(a)(2)(A). *Ritz*, 832 F.3d at 565 n.3. Nevertheless, the Fifth Circuit subsequently held that "although a false representation is no longer *required*, actual fraud can still be proven by showing that the debtor in fact made a false representation." *Selenberg*, 856 F.3d at 398 n.1 (emphasis in original). The Plaintiff in this case alleged a laundry list of representations it argues constituted false representations and did not allege fraud through some other device effected without a false representation. Thus, the Court will perform its analysis under the Fifth Circuit's test for actual fraud by representation.

- Total Operating would not factor any more invoices in connection with the Jetta Project;

- Total Operating was in the midst of obtaining a new commercial bank loan which was in progress of being funded;

- The new commercial bank loan would also be sufficient to pay back the loan to the Plaintiff if that loan was funded before the first $500,000.00 in receipts came back from the Jetta Project;

- The new bank loan would be funded in the time frame contained in the SBA, and therefore the Plaintiff's loan was meant to provide short-term funding;

- Total Operating owned vehicles worth $2,480,313.00 and machinery worth $1,506,241.00 to secure the loan;

- Total Operating's board of managers approved the short-term loan;[21]

- The short-term loan to the Plaintiff would be a secured loan;

- Total Operating had also raised $500,000.00 in equity; and[22]

- Except for Capital One, Total Operating's other creditors had consented to the Plaintiff's loan taking priority over all other security interests.[23]

The Plaintiff alleges that these representations were made primarily through four mediums—through oral communications, the Presentation, the Asset Report, and the SBA. Copies of each of the Presentation, the Asset Report, and the SBA were admitted into evidence, but all evidence regarding oral representations was in-court testimony which was primarily contested on both sides.

### 1. Fraudulent Intent

The Court need not, for purposes of the Plaintiff's § 523(a)(2)(A) claim, determine whether the evidence established that the Debtor made each and every one of these representations. Plaintiff's evidence wholly failed to prove that the Debtor made any representation whatsoever to the Plaintiff with the subjective intent to deceive. Debts that satisfy the fraudulent intent elements

---

[21] The Court finds that the Plaintiff failed to establish that the Debtor made this representation.
[22] The Court finds that the Plaintiff failed to establish that the Debtor made this representation.
[23] The Court finds that the Plaintiff failed to establish that the Debtor made this representation.

of false representations and actual fraud are debts obtained by frauds involving "moral turpitude or intentional wrong, and any misrepresentations must be knowingly made." *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005) (internal quotations omitted) (quoting *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)), *abrogated on other grounds by Ritz*, 136 S. Ct. at 1581. "An intent to deceive may be inferred from 'reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.'" *Selenberg*, 856 F.3d at 400 (quoting *Acosta*, 406 F.3d at 372). The Fifth Circuit in *Palmacci v. Umpierrez* explained further that the "scienter element" may be met "if the maker of the representation (a) knows or believes that the matter is not as he represents it to be; (b) does not have the confidence in the accuracy of his representation that he states or implies; or (c) knows that he does not have the basis for his representation that he states or implies." 121 F.3d 781, 787 (5th Cir. 1997).

"Nevertheless, an honest belief, even if unreasonable, that a representation is true and the speaker has information to justify it does not amount to an intent to deceive." *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 383 (Bankr. N.D. Tex. 2017) (Jernigan, J.). Furthermore, "if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails *or refuses* to carry his expressed intention into effect, there has been no misrepresentation." *Palmacci*, 121 F.3d at 787 (emphasis added).

In this case, to show fraudulent intent the Plaintiff urges the Court to focus on an apparent disconnect between the internal communications amongst board members indicating Total Operating's financial distress and the external representations allegedly made to the Plaintiff. The Plaintiff highlights specifically Total Operating's allegedly dire financial straits, as shown by various emails between the Debtor and Mr. Dean, among others, and the comparatively rosy picture allegedly painted to Mr. Brown. The Plaintiff's case focused heavily on one internal email

in particular, sent prior to the execution of the SBA, in which Mr. Dean told his colleagues that he was firing "a flare in the air" as to the need for additional capital in the short-term.[24]

Furthermore, the Plaintiff focused heavily on the Parties' course of conduct *after* the signing of the SBA as evidence of the Debtor's fraudulent intent. For example, significant testimony was directed toward the alleged "automatic conversion" of the SBA to a senior note and the subsequent execution of the Security Agreement, despite the fact that these events occurred well after the alleged fraudulent representations were made. Finally, the Plaintiff relied on several documents—the Presentation, the Asset Report, and the SBA—to prove the Debtor's fraudulent intent. Plaintiff sought to show that the events that occurred after the execution of the SBA were so incongruous with the representations in these documents, namely, Total Operating's failure to perform under the SBA, that the only reasonable explanation for those events was that the Debtor intentionally misled Mr. Brown and Mr. Durham and that the Debtor never intended to honor any promise he may have made to them.

For the numerous reasons that follow, the Plaintiff failed to show that the Debtor possessed any fraudulent intent whatsoever.

    a. <u>Debtor's testimony as to his honest intent was credible</u>.

The Plaintiff failed to present sufficient evidence to overcome the Debtor's credible testimony, and thus failed to establish fraudulent intent. The Court finds that this case is analogous to *Fairlane Fixed Income Fund, LLC v. Feigl*, in which the creditor alleged that numerous representations made to it in a loan agreement were fraudulent and sought a finding that its debt to

---

[24] The Plaintiff also made much of an email, dated October 26, 2015 (moths after the execution of the SBA), in which Mr. Dean provided options to the Debtor and Mr. Thompson for how to handle the Total Operating's continuing financial struggles, despite the infusion of capital pursuant to the SBA. One of these options, the ninth of the nine he presented, was a bankruptcy filing. Counsel for Plaintiff questioned Mr. Dean about this email and he credibly testified that he had considered bankruptcy "the option that [Total Operating] did not want to do." Furthermore, the Court admittedly struggles to link Mr. Dean presenting bankruptcy as one of nine options for Total Operating moving forward to the Debtor's fraudulent intent in making representations to the Plaintiff months prior.

the debtor was nondischargeable under § 523(a)(2)(A). 2020 WL 7573311, at *3. In *Feigl*, Judge Hale found that the debtor had made several false statements to the creditor, including that the debtor's company was solvent and would use loaned funds solely to purchase certain automobiles. *Id.* at *7. Nevertheless, Judge Hale found that the creditor failed to prove, *inter alia*, that the debtor made those representations with the intent to deceive. *Id.* The debtor's credible testimony as to his lack of fraudulent intent was the focus of this finding. *Id.*[25]

Likewise, in this case the Court finds that the Debtor credibly testified to his genuine intent both in approaching Mr. Brown and his father, Mr. Watters,[26] and in making multiple attempts to ensure that the Plaintiff was repaid. The Debtor credibly testified that he did not recall making many of the alleged misrepresentations to Mr. Brown,[27] notably testifying that he never told Mr. Brown that a new traditional bank loan was imminent, that Total Operating would cease all factoring on the Jetta Project, or that the SBA was a secured transaction creating a security interest in the Plaintiff's favor.[28]

Mr. Dean's testimony corroborates the Debtor's. For example, Mr. Dean testified as to his disappointment in the Debtor executing the Security Agreement in favor of Reticulum in May 2016, but noted that the Debtor was "trying to help [Reticulum] out" in doing so. The Debtor was likewise credible when he testified as to the economics of the Jetta Project and his and Mr. Dean's

---

[25] Notably, the creditor in *Feigl* relied heavily on three key facts as to fraudulent intent, all of which are remarkably similar to the allegations in the instant case: (1) the debtor's company did not keep the loan proceeds segregated, but almost immediately transferred them to the operating account; (2) the debtor's company used very little of the loaned funds to purchase vehicles; and (3) the debtor failed to tell the creditor the extent of the company's debt and operating losses. 2020 WL 7573311, at *3.

[26] The fact that the Debtor sought investment from a family member will be discussed below.

[27] *See infra* n. 44 for a discussion of the disconnect between the entity-Plaintiff, Reticulum, and the individual-witness, Mr. Brown.

[28] The Court notes, again, that it finds *both* the Debtor's and the Plaintiff's witnesses credible. It appeared to the Court that all witnesses were testifying truthfully to the best of their recollection. The Court emphasizes here that the Debtor prevails on this point not simply because the Court believed him more than Mr. Brown or Mr. Durham but because, as will be discussed below, the bulk of the other evidence is more consistent with the Debtor's and his witnesses' testimony than that of the Plaintiff's.

optimism in the arrival of profits therefrom, despite the financial strain it placed on Total Operating. Likewise, each of the Debtor's witnesses, himself included, credibly testified as to the severe and unexpected delays that befell the Jetta Project—including severe regional weather, a pipeline explosion, and the oil and gas crisis ongoing at the time. Together, the testimony painted the picture of a distressed, but honestly run, Total Operating that perhaps grew too rapidly and needed short-term capital.[29] It appears to the Court that, although the Debtor may have made and failed to keep several promises, at all relevant times it was the Debtor's *intention* to perform on his promises. *See Palmacci*, 121 F.3d at 787. For this reason, the Court cannot conclude that the Debtor acted with fraudulent intent.

b. Circumstantial Evidence of the Debtor's Honest Intent

Additional, circumstantial evidence militates heavily against the Debtor's allegedly fraudulent intent. First, the Debtor did not initially seek out Mr. Brown to fund the loan Total Operating needed. Rather, the Debtor went so far as to ask his father, alone, to make the bridge loan in question in this case, a $500,000.00 commitment. Mr. Brown was a back-up plan after the Debtor's father, Mr. Russell Watters, declined to fund the whole amount needed. Furthermore, the Debtor was personally invested in TOI and encouraged his family to do so as well, as part of the "Round 2" financing pursuant to which the Plaintiff infused $500,000.00. Mr. Watters testified in his deposition that he would not normally invest in an oil and gas business, but that he chose to invest out of trust in the Debtor. This strongly indicates that the Debtor honestly believed in the potential for Total Operating to grow and generate returns for himself and his family.

---

[29] The Plaintiff made much of the fact that Total Operating's cash balance per its Quickbooks accounting system was negative immediately before and after the Plaintiff's money was infused. A Quickbooks balance, however, is much like an accounting general ledger and is a mere snapshot of where a balance is at a given time. These "balances" have little, if any, bearing on an entity's financial strength. Moreover, there was no evidence that the Debtor ever had access to Quickbooks such that he could have been aware of the negative balances.

The Debtor also turned down an offer from Mr. Dean to buyout the Debtor's (and Mr. Watters') interests. Mr. Dean credibly testified that he offered "three or four times" what the Debtor had invested in TOI because Mr. Dean was "bullish" about Total Operating. Nevertheless, the Debtor refused this offer and continued in his role at Total Operating. This act was consistent with other email evidence admitted at trial which showed that the Debtor both earnestly believed that Total Operating could thrive and earnestly attempted to make that a reality.[30] For example, after Mr. Dean sent a list of options including filing bankruptcy on October 26, 2015, the Debtor responded at length with his thoughts on how to avoid bankruptcy and keep Total Operating running, as well as mentioning that a goal was to repay Total Operating's debt.

Finally, the Court is compelled to give some credit to the findings of the Arbitration Panel, despite the Court's prior ruling that their findings do not have preclusive effect.[31] The Interim Award was entered in the Plaintiff's favor on December 6, 2018, a date that is significantly closer in time to the events in question. The record produced before the Arbitration Panel was thorough and fulsome, and the Arbitration Panel, like this Court, observed the testimony of each witness in-person. On that record, the Arbitration Panel refused to find that the Debtor made fraudulent misrepresentations.[32]

The Plaintiff argued pithily in closing that most fraudsters in history had hopes for success. These hopes for success, the Plaintiff argues, are not evidence of honest intent, but the Debtor's motive in misrepresenting Total Operating and the SBA to Mr. Brown. The Plaintiff, therefore, believes it presented sufficient evidence for the Court to *infer* fraudulent intent. To so infer,

---

[30] Mr. Thompson also corroborated the Debtor's testimony that Total Operating was in talks with third parties about potential mergers. Negotiations collapsed when the Allens filed suit.

[31] ECF No. 34.

[32] The Arbitration Panel did find that the Debtor made negligent misrepresentations. Candidly, the Court struggles to find even a negligent misrepresentation based on the record in this case.

however, would require the Court to essentially ignore four witnesses' testimony of the Debtor turning down Mr. Dean's cash-out offer, the fact that the Debtor and his close friends and family participated in a second round of capital raise, and the fact that the Debtor sought to *prefer* the Plaintiff with a Security Agreement to the detriment of his personal and professional relationship with Mr. Dean. Would the Plaintiff have the Court believe that the Debtor intended to defraud his mother and father, Mr. Dean's grandmother, and Mr. Thompson as well? The imminently more logical conclusion (and the one the evidence supports) is that the Debtor had honesty of intent throughout his time with Total Operating. Although not direct evidence of fraud or lack thereof, the sum of the circumstantial evidence pertaining to the Debtor's conduct both pre- and post-SBA execution is highly persuasive that the Debtor lacked fraudulent intent.

 c. <u>Documentary Evidence</u>

  In addition to the lack of direct and circumstantial testimonial evidence of fraud, the main documents on which Plaintiff relies fail to show that the Debtor acted with fraudulent intent. In fact, considering all of the evidence elicited, the Plaintiff failed to show that many of the documents contained false representations whatsoever, much less that the Debtor intended to defraud the Plaintiff through them.

  To support its nondischargeability objections, the Plaintiff heavily relied on statements made in the Presentation, which was essentially a pitch book to encourage new financing. However, the Presentation provided to Plaintiff, on the whole, does more to support the Debtor's position than damage it. The Presentation corroborates the somewhat bleak image of Total Operating's financial condition at the time of the transaction. The Presentation opened with a slide describing the "liquidity issues" at Total Operating "exacerbated by a downturn in the general

market and less than ideal accounting procedures."[33]   Of note, the liquidity issues facing Total Operating were not limited to the Jetta Project alone, but rather to the entire company.   The Presentation further explains, expressly, that finding a traditional lender was *not* possible on acceptable terms.[34]   The greater weight of the testimony reflected that the Debtor did not prepare the financial information provided in the Presentation.[35]   Likewise, both Mr. Durham and Mr. Brown testified that they did not heavily focus on the "accounting" aspects of the Presentation.[36] However, the Court finds that financial information enlightening in some specific ways.

In a slide showing abbreviated budget-to-actual income statements, the Presentation highlighted that, despite significant revenue growth, profits and adjusted earnings before interest, taxes, depreciation, and amortization ("**EBITDA**") lagged budgeted figures in 2013 and 2014. This same slide contained "2015 Highlights" including the extreme weather, reduced revenue projection, and changes in the scope and economics of the Jetta Project, in particular.[37]   It is true that the Presentation attempted to minimize or put a positive gloss on these negative points.[38]

[33] The Presentation goes on to explain the difference between the Actual Invoice Method and Percentage of Completion Method for accounting systems.  The Presentation states that Total Operating utilizes the Actual Invoice Method, resulting in a delay in booking revenues until completion of invoices actually delivered.  Thus, the Presentation states that the accounting method causes Total Operating's financial position to look "artificially bleak" until revenues "catch[] up in the end."

[34] A significant amount of testimony at trial related to alleged representations that a bank loan from a traditional lender was imminent.  This portion of the Presentation, which was provided to Mr. Brown, directly contradicts that allegation. Additionally, the Debtor flatly denied representing to Mr. Brown that a new bank loan was forthcoming, or making any related representation.  Thus, the evidence failed to establish any of the Plaintiff's alleged misrepresentations related to a "new bank loan."  *See* list of misrepresentations *supra* at 19–20.

[35] Mr. Dean and Mr. Thompson corroborated the Debtor's testimony on this point.

[36] The Plaintiff does challenge whether the machinery and vehicle values were accurate.  The Plaintiff failed to prove that they were not accurate.  Specifically, the Plaintiff alleges that the Presentation states that "Total Operating owned vehicles worth $2,480,313 and machinery and equipment worth $1,506,241 to secure the loan."  Given that the Presentation includes historical cost and accumulated depreciation figures, no representation can be inferred as to "worth" or "value."  Likewise, the SBA specifically provides that it is *not* intended to be a loan.

[37] The information related to the Jetta Project, in addition to the information about Total Operating's accounting methodology, directly contradicts the alleged misrepresentation that the Jetta Project would "provide quick cash flow to pay back the short-term loan."  *See* list of misrepresentations *supra* at 19–20.

[38] In *Metz v. Bentley (In re Bentley)*, the Bankruptcy Court for the Southern District of Texas recognized that, under Texas law, future predictions and opinions, especially those regarding the future profitability of a business, cannot form a basis for fraud as a matter of law."  531 B.R. 671, 689 (Bankr. S.D. Tex. 2015) (quoting *Zar v. Omni Indus.,*

27

Nevertheless, the negative points are clearly conveyed and, in any event, consistent with the Debtor's and his witnesses' testimony as to the financial and operational status of Total Operating at the time of its making. Therefore, the Court is left with the question of whether the Presentation actually contains false representations, much less false representations made with fraudulent intent.

Another focal point of the trial was the Asset Report.[39] The Plaintiff urges this Court to find a fraudulent misrepresentation in the Asset Report because it included items of leased equipment and leased vehicles, but allegedly purports to show that Total Operating owned those assets. The evidence elicited at trial showed that the Asset Report likely did include items of leased equipment. The credible testimony of the Debtor and Mr. Dean, however, was that neither of them provided the Asset Report to Mr. Durham or Mr. Brown prior to the execution of the SBA. Moreover, although Mr. Brown testified that he had seen the Asset Report prior to the execution of the SBA, Mr. Durham could not recall ever having seen the Asset Report. This is particularly important as, at the time the SBA was executed, Mr. Durham was still controlling the Plaintiff and, in fact, executed the SBA on the Plaintiff's behalf.[40] Thus, it is difficult for the Court to find that

---

*Inc.*, 813 F.2d 689, 693 (5th Cir. 1987)). Although § 523(a)(2)(A) incorporates the general common law of torts, rather than the law of any particular state, the Court nevertheless finds this principle persuasive in this context. *See Field*, 516 U.S. at 71 n.9 ("We construe the terms in § 523(a)(2)(A) to incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State.") Many of the Debtor's representations are more accurately characterized as projections of future profitability than fraudulent representations.

[39] The Asset Report was admitted into evidence as Plaintiff's Exhibit 18. The Ritchie Report, which also purported to value Total Operating's vehicles and equipment, was also a focal point at trial. The date of the Ritchie Report, however, was December 15, 2015. Thus, the Ritchie Report was not created until well after the transaction in question. Thus, it is not possible that the Ritchie Report contained any representation on which the Plaintiff could have relied in executing the SBA. As such, the Court finds the Ritchie Report and testimony related thereto to be of very little relevance.

[40] There was some testimony elicited at trial indicating that Mr. Durham may have been acting as an agent on behalf of Mr. Brown around the time that the SBA was executed. The Court need not determine precisely the contours of the relationship between Mr. Durham, Mr. Brown, and the Plaintiff, however, because the record was insufficient to show that the Debtor acted with fraudulent intent at any point relevant to these proceedings. Additionally, and as will be discussed below, the Court finds that the record established a lack of justifiable reliance on either Mr. Brown's or Mr. Durham's part.

the Debtor made any representation *to the Plaintiff* in the Asset Report at all, much less that the Debtor had fraudulent intent in making it.

The Court draws similar conclusions with regard to the SBA, which Mr. Brown admitted that he did not even review prior to its execution by Mr. Durham[41] on behalf of the Plaintiff, and Mr. Durham testified he signed it because Mr. Brown "was good with it."[42] As discussed in connection with the analysis of § 523(a)(2)(B), many of the alleged oral representations are contradicted by the terms of the SBA. Nevertheless, the evidence at trial showed that any representations made in the SBA by the Debtor to the Plaintiff were devoid of fraudulent intent. Because the Plaintiff's evidence failed to establish the Debtor's fraudulent intent in making any representations, whether orally or through any of the relevant documentary evidence, the Court cannot conclude that the Plaintiff's debt is nondischargeable.

## 2. Justifiable Reliance

"In evaluating a cause of action under section 523(a)(2)(A), whether it is a question of . . . false representation or of actual fraud, the court must determine that the plaintiff . . . justifiably relied upon the representations made to [it] by the defendant." *Baker v. Sharpe*, 351 B.R. 409, 423 (Bankr. N.D. Tex. 2006) (Jernigan, J.) (citing *Field v. Mans*, 516 U.S. 59, 61 (1995)). Justifiable reliance, as opposed to reasonable reliance, is a subjective test considering the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than . . . the application of a community standard of conduct in all cases." *Id.* (internal quotations omitted). Where the falsity of a misrepresentation would be obvious to the plaintiff had he or she used her senses to make a cursory examination or investigation, the plaintiff is not entitled to

---

[41] Mr. Durham testified that he did not speak to the Debtor the day the deal changed from a secured loan to a sale-buyback arrangement.

[42] If Mr. Durham was acting as Mr. Brown's agent, then the Plaintiff is bound by Mr. Durham's review, or lack thereof, of the relevant document.

blindly rely upon that misrepresentation. *Id.* Finally, it is well-settled law that a plaintiff may not justifiably rely on an oral representation that is in direct contradiction of the terms of an unambiguous written contract.[43]

Here, the Court finds that neither Mr. Brown nor Mr. Durham could prove that they justifiably relied on any representation made to them.[44] Both of these individuals hold MBAs from Pepperdine University. Mr. Durham's career consists of financial advisory and investment services. Mr. Brown, although trained and employed originally as a civil engineer, testified that he has made more than thirty "highly collateralized short-term loans" over twenty years, typically backed by real property assets. Plaintiff described Mr. Brown as a "hard-money lender." In short, neither of these individuals lacks for experience or knowledge about financial transactions like the SBA.

The evidence showed that neither Mr. Brown nor Mr. Durham hired counsel or otherwise performed any meaningful further inquiry, independent research, independent verification, or other due diligence prior to executing the SBA. Mr. Brown, in particular, repeatedly testified that he believed certain facts because they were what the Debtor told him, even where the documentary

---

[43] *Levels v. Merlino*, 969 F. Supp. 2d 704, 726 (N.D. Tex. 2013) (citing *Taft v. Sherman*, 301 S.W.3d 452, 458 (Tex. Ct. App. 2009); *Prendes v. Select Portfolio Servicing, Inc.*, No. 4:12–cv–337–Y, 2012 WL 6913511, at *6 (N.D. Tex. Dec. 28, 2012); *Athey v. Mortgage Electronic Registration Systems, Inc.*, 314 S.W.3d 161, 164–65 (Tex. Ct. App. 2010)); *see Government Computer Sales, Inc. v. Dell Marketing*, 199 Fed. App'x 636, 639 (9th Cir. 2006) (citing *In re U.S. Office Prods. Co. Sec. Lit.*, 251 F. Supp. 2d 58, 75 (D.D.C. 2003)).

[44] At this point in the Court's analysis the Court is compelled to return to the fact that the Plaintiff in this case is *Reticulum*, not Mr. Brown nor Mr. Durham, individually. The bulk of the Plaintiff's case-in-chief, however, consisted of Mr. Brown's testimony as to what representations were made to *him individually* prior to the execution of the SBA. The Plaintiff also elicited testimony that many, if not all, of the alleged misrepresentations were made to Mr. Durham as well, but there was an appreciable amount of conflicting testimony as to which representations were made and to whom they were made. As discussed above, the Plaintiff's claims fail for failure to prove by a preponderance of the evidence that the Debtor made any representation with fraudulent intent. Thus, sorting through the entanglement between the Plaintiff, as a corporate entity, Mr. Durham, and Mr. Brown (who did not come to own the Plaintiff until well after these events transpired), is not entirely necessary. Furthermore, as will be discussed below, the Court finds that neither Mr. Durham nor Mr. Brown, considering their personal qualities and educational background, justifiably relied on any representation made to them.

evidence was inconsistent with the alleged oral misrepresentations.[45] Essentially, neither of these two sophisticated investors performed any due diligence beyond reviewing *some* of the documents presented to them.[46]

The Plaintiff downplayed the inherent riskiness of the SBA transaction, suggesting instead that the Debtor painted a fraudulent picture of a very secure deal. The Court sees things differently. The Plaintiff described Mr. Brown as a "hard-money lender" who, despite being sophisticated, rarely invested in the oil and gas industry. Even if the Court were to assume that the Debtor made each of the alleged representations to Mr. Brown, the Court finds that Mr. Brown did none of the traditional research that so-called "hard-money lenders" typically do to protect themselves in this inherently risky space. Hard-money lending relies heavily on diligence, valuations, collateral documentation, and security through recourse to hard assets. The Court is left questioning how it can square those hallmarks of hard-money lending with the facts of this case in which the deal: (1) was admittedly outside the norm for Mr. Brown, (2) was based on minimal, if any, due diligence, (3) was pushed through in approximately one week's time, (4) was executed without Mr. Brown negotiating or, in fact, even reading the operative document, and (5) was entered into with full knowledge that the deal amounted to a profits interest in an oil and gas company in a cash crisis and whose hard assets (*i.e.*, equipment and vehicles) were encumbered by a lienholder who refused to subordinate.[47]

---

[45] For example, Mr. Brown testified that the Debtor represented to him that a new traditional bank loan was "imminent" prior to the execution of the SBA. The Presentation, however, expressly notes on the third slide that "terms and covenants were not acceptable" from traditional lenders and specifically provided four enumerated reasons for a "lack of lender interest." Notwithstanding the language on this slide, Mr. Brown testified strenuously that the Debtor orally represented to him the *exact* opposite.

[46] Notably, the loan document through which FABNEXT Corp. funded Reticulum with the cash to execute the SBA provided that FABNEXT Corp. "had the opportunity to assess" the SBA transaction "including . . . all collateral and security documents and agreements, all due diligence information and all other information regarding the loan by [Reticulum] to [Total Operating] sufficient for [FABNEXT Corp.] to make an informed decision" to lend to Reticulum. Mr. Brown signed this document as the President of FABNEXT Corp.

[47] A fact of which Mr. Brown was aware prior to Reticulum's execution of the SBA.

Rather than "infer" fraudulent intent based on the circumstances under which the Debtor approached Mr. Brown, as the Plaintiff has asked, the Court finds it more reasonable to look to the documents that Mr. Brown *did* review before entering the SBA. Again, even assuming that the Debtor did make each of the representations, and further assuming he did so with fraudulent intent (which the Court previously found he did not), the Court finds that the documents should have put a lender such as Mr. Brown on notice that additional investigation was needed.

"Justifiable reliance turns upon the plaintiff's own capacity and knowledge, or the knowledge with which the plaintiff may be fairly charged to have from the facts within his . . . observation in light of his . . . individual case." *Sharpe*, 351 B.R. at 423 (citing *Field*, 516 U.S. at 72). Here, Mr. Brown and Mr. Durham were presented with a company in the midst of a liquidity crisis. The situation was plainly described to them in the Presentation. From receipt thereof, the Court finds that Mr. Brown and Mr. Durham can be fairly charged with knowledge of the "cash crunch" at Total Operating. Their subsequent failure to investigate the circumstances further is inconsistent with their knowledge, skill, and experience in financial transactions. Therefore, the Court finds that neither Mr. Brown nor Mr. Durham justifiably relied on any representation made to them.

In conclusion, the Court has carefully weighed the evidence, including the credibility determinations detailed above, and concludes that the Plaintiff failed to carry its burden of proof on both fraudulent intent and justifiable reliance. Thus, the Plaintiff has failed to show that its debt held by the Debtor is nondischargeable under § 523(a)(2)(A).

### B. § 523(a)(2)(B)

To prove nondischargeability pursuant to § 523(a)(2)(B), the Plaintiff must show that the Debtor owed the Plaintiff a debt "for money, property, services, or an extension, renewal, or

refinancing of credit to the extent obtained by . . . use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable . . . reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." 11 U.S.C. § 523(a)(2)(B).

The Plaintiff's claim under § 523(a)(2)(B) suffers from similar evidentiary gaps as does its claim under § 523(a)(2)(A). The Plaintiff relies on three primary writings: (1) the Asset Report, (2) the Presentation, and (3) the SBA. As was discussed at length above, the Plaintiff's witnesses' testimony showed that, even if the Debtor *had provided* the Asset Report to Mr. Brown or Mr. Durham, which he credibly testified he did not, only Mr. Brown can recall seeing it and reviewing it prior to the execution of the SBA, and specifically at a time when the "deal" was contemplated as a short-term secured loan. Thus, the Court cannot find that the debt owed to *Reticulum* pursuant to the SBA was obtained through use of the Asset Report as a written statement. Even so, the greater weight of the testimony was that, if anyone provided the Asset Report to Mr. Brown, it was likely Mr. Dean,[48] rather than the Debtor. It is also noteworthy to mention that Mr. Dean testified that the Asset Report, in the form in which it was admitted into evidence, was (i) incomplete, (ii) only used to calculate monthly depreciation, and (iii) dated as of more than a year prior to the transaction. Furthermore, Capital One's blanket lien covered each of the pieces of equipment in the Asset Report. The evidence showed that Mr. Brown and Mr. Durham were aware of Capital One's lien (and its refusal to consent to subordinate), which forced the Parties to structure the transaction as a sale-buyback. Because the Parties abandoned their original plans to execute a note and security agreement, and Mr. Brown and Mr. Durham were aware of the encumbrance on the

---

[48] Mr. Dean flatly denied this fact.

assets, the Court finds that Asset Report is not particularly relevant as the vehicles listed thereon did not constitute collateral for the SBA.

With regard to the Presentation, the Court found above that the contents of the Presentation were either true, or merely presented in a persuasive manner consistent with private equity investors and managers attempting to drum up interest in investing (i.e., immaterially false or published without the intent to deceive). *See Bentley*, 531 B.R. at 689 (noting that under Texas law projections cannot form the basis for fraud as a matter of law). The Presentation disclosed, *inter alia*, that no traditional bank lender was willing to lend to Total Operating on favorable terms, net profit and EBITDA significantly lagged budgets in 2014 and were projected to do so in 2015, the Jetta Project was larger and more cost-intensive than originally estimated, and that severe regional weather was causing significant slowdowns in project completion. The Debtor's credible testimony further bolstered that the portions of the Presentation that he created reflected the facts as he honestly believed them to be at the time. The *sole* controverting evidence presented with regard to the Presentation was the alleged oral misrepresentations that were inconsistent with its contents. Section 523(a)(2)(B), however, requires a *writing* meeting the elements described thereunder. 11 U.S.C. § 523(a)(2)(B); *Sharpe*, 351 B.R. at 422. Therefore, the Plaintiff cannot now rely on the alleged oral misrepresentations to prove nondischargeability where it has failed to show that the Presentation, alone, contained materially false statements.

The Court finds that there was no representation made in the SBA meeting the requirements under § 523(a)(2)(B). First, Mr. Brown testified that he did not even review the SBA prior to its execution. Likewise, Mr. Durham was somewhat equivocal about his input into and review of the SBA, testifying, in substance, that he signed the SBA on behalf of Reticulum when Mr. Brown said he "was good with it." Second, Plaintiff relies on strained interpretations of unambiguous

contract language in urging this Court to find materially false representations in the SBA. Much time and testimony at trial was devoted to the section of the SBA that read: "[Total Operating] agrees to pay over to [Plaintiff] the unfactored [Jetta Project] receivables from [Jetta Project] invoices generated after July 27, 2015 in excess of the Triumph credit limit as received as installment payments." Plaintiff urges this Court to find in this contractual language a promise that Total Operating will cease all factoring of invoices from the Jetta Project. The Court finds no such promise in this language. On the contrary, the Court finds it equally plausible that this language put the Plaintiff on notice of Total Operating's intent to continue factoring. The Court questions what "unfactored receivables" means if not that Total Operating intended to have some factored and some unfactored receivables. Likewise, the SBA does *not* provide that receivables from the Jetta Project would be siloed in any way.[49] Total Operating's failure to actually pay over receivables under the SBA was, at most, a breach of the contract. As has been noted repeatedly herein, breach of contract does not equate to fraud. *Palmacci*, 121 F.3d at 787.

Additionally, Plaintiff points to the provision of the SBA that provided that the Plaintiff's remedies on a default under the SBA *may include* conversion into a senior subordinated note" the term of which would "be no greater than one year." Plaintiff vehemently argued that this language provided for an "automatic conversion" of the SBA to a note, which the Debtor had no intention of recognizing. Again, the Court finds no evidence supporting that this provision contained any misrepresentation whatsoever. Moreover, later demands for conversion, and the execution of the Security Agreement, belie any argument that the Plaintiff believed the conversion to be automatic.

---

[49] The SBA is also silent as to several other alleged misrepresentations, namely, that the first $500,000.00 of Jetta Project receivables would be remitted to the Plaintiff and that the sale price pursuant to the SBA would be used exclusively for the Jetta Project. *See* list of misrepresentations *supra* at 19–20. Moreover, slide 13 of the Presentation details the sources and uses of the future funding and details no "earmarking" of the $500,000.00 loan solely for the Jetta Project. Finally, both Mr. Dean and the Debtor testified that Total Operating put more than $500,000.00 of working capital into the Jetta Project subsequent to the execution of the SBA.

Finally, the Court's findings above with regard to fraudulent intent apply with equal force to the analysis under § 523(a)(2)(B). The record simply lacked evidence pointing to the Debtor acting at any point with fraudulent intent, especially in the face of the Debtor's extensive, credible testimony. For all of these reasons, the Plaintiff's claim under § 523(a)(2)(B) must also fail.

### C. 11 U.S.C. § 523(a)(6)

The Plaintiff's final argument is that the Debtor's debt to it should be excepted from discharge under § 523(a)(6), which pertains to willful and malicious injury by the debtor to another entity. 11 U.S.C. § 523(a)(6); *Feigl*, 2020 WL 5753311, at *8. The burden is on the Plaintiff to show "either an objective substantial certainty of harm or a subjective motive to cause harm." *Id.* (quoting *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998)).

The circumstances of this case as detailed above do not indicate willfulness or malice on the part of the Debtor. The Plaintiff urges the Court to find willfulness and malice in the Debtor's sale or attempts to sell Total Operating's equipment and trucks, which the Plaintiff asserts was its collateral pursuant to the Security Agreement. The evidence at trial, however, definitively failed to establish that such sales and attempts at sales were carried out with willfulness and malice. In fact, there was evidence of the Plaintiff's knowledge of the sales. Second, Plaintiff argues that the inclusion of the factoring language quoted above in the SBA constituted a willful and malicious injury. The Court likewise finds no willful and malicious intent with regard to this unambiguous contract language. Finally, the Plaintiff attempted to show at trial that Total Operating received unfactored receivables from the Jetta Project and willfully and maliciously failed to remit them to Total Operating as required under the SBA. Tellingly, when faced with questions about these amounts, the Debtor and Mr. Dean admitted that certain Jetta Project invoices were unfactored, but also credibly testified that they were "retention," which are funds retained by the contracting

36

company (*i.e.*, Jetta).  Mr. Dean, specifically, testified that Total Operating never received these funds and could not remit them to the Plaintiff.  The evidence put forth by the Plaintiff on section 523(a)(6) beyond the credible testimony of the Debtor and Mr. Dean was minimal, and in any case a far cry short of proving willfulness and malice.  An equally plausible case was made that attempts to sell collateral were attempts to stave off Total Operating's bankruptcy and that it was litigation brought by the Plaintiff against Total Operating that was the proverbial nail in its coffin.

Even setting aside the evidentiary gaps, "this exception to discharge is so narrowly tailored, it is rarely successfully fairly litigated." *Feigl*, 2020 WL 7573311, at *8.  Willful and malicious injury, where it is successful, is almost universally in the context of a tort claim.  *Id.*  Here, although Plaintiff has ardently attempted to fit the facts into common law fraud, the evidence militates heavily in favor of these events stemming from a potential breach of contract, if any wrongdoing is to be found.  Thus, the Court finds that Plaintiff has failed to prove that its debt is nondischargeable pursuant to § 523(a)(6).  Because the Plaintiff has so failed, the Court need not address the Plaintiff's Count 4 for attorney's fees, nor the affirmative defenses the Debtor raised in his objection.

## V. <u>CONCLUSION</u>

Ralph Waldo Emerson once famously said that for "every minute you are angry you lose sixty seconds of happiness."  Mr. Brown has doggedly pursued the Debtor and Mr. Dean since 2016.  This trial came to this Court after years of related civil litigation brought by Plaintiff, against the Debtor and Mr. Dean and, in some instances, their families (before at least two state courts,

one arbitration tribunal, and two bankruptcy courts).[50] Criminal complaints have been filed.[51] Millions of dollars have been spent by Mr. Brown alone on attorney's fees. It was apparent to the Court that Mr. Brown harbors immense anger[52] that has pushed these parties to their respective breaking points. To say that the litigation and the attorney's fees spent thereon have outsized this controversy is a massive understatement.[53] As has been described herein, the evidence on the record *does not* show a scheme, formulated behind Mr. Brown's and Mr. Durham's backs, to defraud Mr. Brown of $400,000. This Court is not the first tribunal to determine there was no fraud here, and unfortunately, given the ongoing litigation in other courts, it may not be the last court to hear these issues. The Plaintiff has forcefully and repeatedly tried to fit the square peg of the facts of this case into the round hole of fraud and nondischargeability under the Bankruptcy Code.

On the contrary, the evidence elicited at trial tells the often-recurring bankruptcy story of a company's buyout by private equity investors, the cash out of eager sellers, rapid expansion, an ensuing liquidity crisis, and eventual collapse. The evidence showed many mistakes and antagonistic factors, both within and beyond the Debtor's control, but came far, far short of

---

[50] This does not even take into account litigation and claims against Total Operating, which the Plaintiff sought, but ultimately eschewed in favor of pursuing the two individual officers. The Plaintiff went so far as to buy Total Operating's claims against Mr. Dean and the Debtor from the Total Operating estate for $50,000.00 and to subordinate its claim therein. Such claims were not ultimately pursued.

[51] This Court was quite shocked to learn of the Plaintiff's counsel assisting the Plaintiff with the preparation and filing of criminal complaints against the Debtor and Mr. Dean during the course of civil litigation, especially given that the amount of alleged damages on the original criminal complaint is the exact dollar value contained in the Ritchie Report that the Plaintiff alleges is proof of the Debtor *overvaluing* its assets (given that the Ritchie Report included leased assets, as well as assets that Total Operating owned). *See* Tex. R. Prof. Conduct 4.04; Tex. Comm. on Prof. Ethics, Op. 455, V. 51 Tex. B.J. 1060 (1988) (Plaintiff's attorney in a pending civil suit for breach of contract, conversion and fraud should not provide legal services to assist his or her client in initiating a criminal proceeding against defendant where such assistance is not required).

[52] Mr. Brown testified before the Arbitration Panel that he was "pissed off" because he believed that the Debtor and Mr. Dean "lied to [his] face" and changed their mind about what the deal was after executing the SBA.

[53] Even after settling with the Debtor's father, Mr. Watters for $325,000 in 2019, which notably is only $75,000 shy of the original amount loaned to Reticulum by Mr. Brown's companies, Mr. Brown on behalf of the Plaintiff pursued the Debtor and Mr. Dean all the way into bankruptcy. Although the Court certainly understands a litigant's desire to recoup losses and the attorney's fees spent achieving judgments, there comes a time when litigation is simply vindictive and should cease.

showing that the Debtor intended, at any point, to defraud Mr. Brown, Mr. Durham, or the Plaintiff itself. The Debtor appears to have conducted himself throughout these events honestly, if unfortunately.

Thus, the Plaintiff failed to carry its burden of proof as to fraudulent intent, from which the remainder of the dominoes fall. As to § 523(a)(2)(A), the Plaintiff also failed to show justifiable reliance by a preponderance of the evidence, especially considering Mr. Brown's and Mr. Durham's lack of diligence and in light of their background, knowledge, and expertise. As to § 523(a)(2)(B), the Plaintiff failed to point to a single representation, in any document provided to the Plaintiff, that was materially false. Finally, as to § 523(a)(6), the Plaintiff failed to show even the outline of willfulness or malice in any of the Debtor's actions. The Court sincerely hopes that this ruling provides some closure in a series of events that has carried on for far too long. The Debtor is entitled to a fresh start and a judgment will be entered in favor of the Debtor.

### ### END OF MEMORANDUM OPINION ###